658 A.2d 1357

**COMMONWEALTH of Pennsylvania**

v.

**Gaye MORLEY, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 6, 1994.

Filed May 24, 1995.

James D. Crawford, Philadelphia, for appellant.

Stuart B. Suss, Asst. Dist. Atty., Frazer, for Commonwealth, appellee.

Before ROWLEY, P.J., and CAVANAUGH, WIEAND, CIRILLO, DEL SOLE, POPOVICH, JOHNSON, HUDOCK and SAYLOR, JJ.

SAYLOR, Judge:

This is an appeal from a judgment of sentence for first degree murder entered in the Court of Common Pleas of Chester County following a degree of guilt hearing.

Appellant, Gaye Morley, entered a plea of guilty to a general charge of criminal homicide in connection with the shooting death of her boyfriend, Stephen Lauritano. At the degree of guilt hearing, Appellant asserted a diminished capacity defense, arguing that she had been in a "depersonalized state" at the time of the killing and therefore had been unable to formulate a specific intent to kill. At the conclusion of the defense's case-in-chief, defense counsel joined a prosecution request to permit the Commonwealth's psychiatric expert, Dr. Kenneth Kool, to conduct an examination of Appellant prior to his testifying. Pursuant to this agreement, the trial court entered an order appointing Dr. Kool to examine Appellant in order to permit him to express an opinion regarding Appellant's mental state at the time of the incident in which she had been charged and permitting Dr. Kool to examine the hospital records of Appellant in order to assist him in forming his opinion. The trial court also ordered that defense counsel be notified of the date and time of the examination so that they could be present. Dr. Kool examined Appellant and thereafter testified at the degree of guilt hearing as a rebuttal witness for the Commonwealth.

At the conclusion of the hearing, the trial court found Appellant guilty of first degree murder. Post-trial and supplemental post-trial motions were denied after an evidentiary hearing, and Appellant was sentenced to life imprisonment.

On appeal, Appellant contends that her right against compulsory self-incrimination was violated when she was allegedly compelled to participate in an interview with the Commonwealth's psychiatrist without being told that she had a right not to answer the psychiatrist's questions. She further contends that her statements concerning the commission of the crime which she made during the examination were admitted as evidence of her intent to kill, thereby violating her privilege

against self-incrimination, and that counsel was ineffective for failing to advise her of her right to remain silent during the examination and for failing to object to the use of her statements at the degree of guilt hearing. She also contends that counsel was ineffective for failing to call character witnesses on her behalf.

In arguing that her Fifth Amendment rights were violated, Appellant relies primarily on the decision of the Pennsylvania Supreme Court in *Commonwealth v. Pomponi*, 447 Pa. 154, 284 A.2d 708 (1971). In *Pomponi*, the court reaffirmed its prior rulings that the Fifth Amendment precludes a defendant from being compelled to answer questions posed by the Commonwealth's psychiatric expert during a court-ordered psychiatric examination. Appellant also relies upon *Commonwealth v. Hale*, 467 Pa. 293, 356 A.2d 756 (1976), in which the Pennsylvania Supreme Court further held that a defendant has the right to be advised of his privilege against self-incrimination prior to answering any questions during a court-ordered psychiatric examination. Therefore, Appellant claims that because her statements about the shooting were obtained in violation of her Fifth Amendment rights, the use of these statements at her degree of guilt hearing constituted reversible error.

Since the Pennsylvania Supreme Court's decisions in *Pomponi* and *Hale*, however, several decisions of the United States Supreme Court have addressed the applicability of the Fifth Amendment to court-ordered psychiatric examinations and the use of the results of such examinations as evidence at trial.

First in this line of decisions is *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), which involved a criminal defendant who had neither requested a psychiatric examination nor attempted to introduce any psychiatric evidence at trial. However, a psychiatrist had examined the defendant pursuant to a court order for the purpose of determining the defendant's competency to stand trial. The Supreme Court considered the applicability of the Fifth Amendment privilege against self-incrimination, and held that "[a] criminal defendant, who neither initiates a psychiatric evalua-

tion nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.*, 451 U.S. at 468, 101 S.Ct. at 1876, 68 L.Ed.2d at 372. The Supreme Court observed, however, that the result might have differed had the defendant raised an insanity defense and thereby placed his mental status at issue. *Id.*, 451 U.S. at 465–466, 101 S.Ct. at 1874, 68 L.Ed.2d at 370–371.

In *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Supreme Court held that when a defendant raises an insanity defense, not only can he be compelled to submit to a psychiatric examination, but the testimony of the examining psychiatrist may also be admitted as evidence concerning the issue of insanity. The defendant in *Buchanan* had presented a defense of "extreme emotional disturbance" and had offered testimony concerning reports which contained evaluations of his mental condition. Distinguishing these facts from *Smith*, the Court noted that the defendant's psychiatric examination had been at the joint request of the Commonwealth and defense counsel, and stated that

if a defendant requests such an examination or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.

*Buchanan*, 483 U.S. at 422–423, 107 S.Ct. at 2917–2918, 97 L.Ed.2d at 355.

Finally, in *Powell v. Texas*, 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989), the United States Supreme Court further acknowledged the necessity of providing the government with a means to rebut a mental status defense. Noting its previous decisions in *Smith* and *Buchanan*, the Court observed:

"[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the state of the only effective means it has of controverting his proof on an issue that he has interjected into the case."

*Powell, supra,* 492 U.S. at 684, 109 S.Ct. at 3149, 106 L.Ed.2d at 556, quoting *Estelle v. Smith,* 451 U.S. at 465–466, 101 S.Ct. at 1874, 68 L.Ed.2d at 370–371.

In addition to the decisions of the United States Supreme Court, many federal court decisions have also addressed the issues of whether a defendant who has raised a mental status defense can be compelled to submit to a psychiatric examination, and whether the government may thereafter use testimony concerning the results of such an examination to rebut such a defense.

In discussing the issue of whether a defendant may be compelled to submit to a psychiatric examination, federal courts have generally reiterated the principles enunciated in *Smith, Buchanan* and *Powell,* and have further emphasized that

> [i]t would be a strange situation, indeed, if, first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense and, second, if the government is to have the burden of proof, ... and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which is perhaps the most trustworthy means of attempting to meet that burden.

*United States v. Byers,* 740 F.2d 1104, 1113 (D.C.Cir.1984), quoting *Pope v. United States,* 372 F.2d 710, 720 (8th Cir.1967) (*en banc* ), vacated and remanded on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), *cert. denied,* 401 U.S. 949, 91 S.Ct. 953, 28 L.Ed.2d 232 (1971).

Thus, the Circuit Courts of Appeals are virtually unanimous in holding that, where a defendant interposes at trial the defense of insanity, his Fifth Amendment privilege against self-incrimination is not violated by a court-ordered psychiatric examination. *See, McNeill v. Fulcomer,* 753 F.Supp. 1294, 1298 (E.D.Pa.1990); *Byers, supra,* 740 F.2d at 1111.

In addition, federal courts have uniformly held that "[a]lthough the fifth amendment normally bars the government from subjecting the defendant to a psychiatric examination

without warning him of his constitutional rights, that bar is waived once the defendant introduces psychiatric evidence in support of a mental defense." *Hendricks v. Vasquez*, 974 F.2d 1099, 1108 (9th Cir.1992), citing *Powell v. Texas, supra*, 492 U.S. 680, 109 S.Ct. 3146. *See also: Silagy v. Peters*, 905 F.2d 986, 1005 (7th Cir.1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); *Granviel v. Lynaugh*, 881 F.2d 185, 190 (5th Cir.1989), *cert. denied*, 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990); *Washington v. Murray*, 952 F.2d 1472, 1480 (4th Cir.1991).

Finally, the majority of federal courts which have considered the issue of whether the government may use psychiatric testimony to rebut a defendant's mental status defense have generally followed the holding of the United States Supreme Court in *Buchanan* that when a defendant introduces into evidence psychiatric testimony to support a mental status defense, the state may introduce testimony of examining psychiatrists on that issue as well. *McNeill, supra*, 753 F.Supp. at 1298; *Byers, supra*, 740 F.2d at 1111. The rationale underlying this position was expressed by the Tenth Circuit in *United States v. Julian*, 469 F.2d 371 (10th Cir.1972):

[W]hen the defendant has raised the issue of insanity and the psychiatrist is called to testify on this question, the defendant must not be allowed to muzzle him at his option.

*Id.,* 469 F.2d at 376.

 Thus, it is now clear that when a defendant places his mental status at issue, he may be subjected to compulsory examination by court-appointed psychiatrists, and psychiatric testimony may be introduced by the government at trial to rebut his mental status defense without violating the Fifth Amendment.[1] Accordingly, Appellant could constitutionally

1. Although the guarantees provided by the Pennsylvania Constitution may afford greater protection than the guarantees of the federal constitution, *Commonwealth v. Sell*, 504 Pa. 46, 63–64, 470 A.2d 457, 466–467 (1983), the privilege against self-incrimination embodied in Article I, Section 9 of the Pennsylvania Constitution does not expand upon the protection afforded by the Fifth Amendment of the United States Constitution; rather, the protection afforded by the two constitutional provisions is co-extensive. *Commonwealth, Department of Environmental Resources v. Marra,* 527 Pa. 526, 527 n. 2, 594 A.2d 646 n. 2 (1991).

be required to submit to a psychiatric examination without being advised of her Fifth Amendment privilege against self-incrimination,[2] and the examining psychiatrist's testimony concerning his medical conclusions based upon such examination was admissible at Appellant's degree of guilt hearing.

Appellant also argues, however, that Dr. Kool, the court-appointed psychiatrist, should' not have been permitted to testify as to specific statements made by Appellant during the examination, reasoning that such testimony amounts to compelled inculpatory testimony in violation of Appellant's constitutional rights. We disagree, and on the contrary conclude that because Appellant's statements to Dr. Kool concerning the events surrounding the commission of the crime were admitted for the limited purpose of rebutting her assertion of diminished capacity, no violation of Appellant's constitutional rights occurred.

Although no United States Supreme Court decision has yet dealt specifically with the issue of the admissibility of specific statements of the accused, federal circuit courts which have considered this issue have held that

> a psychiatric expert can relate statements of the defendant which are used to determine sanity. In *United States v. Byers*, 740 F.2d 1104 (D.C.Cir.1984) (en banc), the court held that the Fifth Amendment was not violated by a Government psychiatrist's testimony detailing unrecorded

Accordingly, when the privilege against self-incrimination is invoked in a state proceeding, federal standards govern. *Commonwealth v. Carrera*, 424 Pa. 551, 227 A.2d 627 (1967). Therefore, the decisions of federal courts concerning the applicability of the privilege against self-incrimination to court-ordered psychiatric examinations and to the admissibility of the results of such examinations are instructive and persuasive, in addition to the holdings of the United States Supreme Court, which are binding.

2. Contrary to Appellant's assertion, the record reveals that Appellant consented to the examination because defense counsel anticipated that the results would support Appellant's claim of diminished capacity. Therefore, Appellant was not, as she claims, compelled to submit to the examination. However, because Appellant had raised a claim of diminished capacity, which is a mental status defense, under *Smith* and *Buchanan* she constitutionally could have been compelled to submit to such an examination.

statements made by the defendant during a court-ordered examination. The court concluded that to hold otherwise would have an "unreasonable and debilitating effect" on "society's conduct of a fair inquiry into the defendant's culpability." *Id.* at 1113.

*Isley v. Dugger,* 877 F.2d 47, 50 (11th Cir.1989). Likewise, psychiatric testimony has also been held admissible to rebut the defense of diminished capacity. *United States v. Halbert,* 712 F.2d 388, 390 (9th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984).

In holding that psychiatric testimony may be used at trial to rebut a defendant's mental status defense, federal courts have carefully distinguished between psychiatric testimony concerning the issue of a defendant's sanity and psychiatric testimony concerning the issue of a defendant's guilt. In *Gibson v. Zahradnick,* 581 F.2d 75 (4th Cir.1978), the Fourth Circuit acknowledged this difference, noting that

> [*United States v. Albright,* 388 F.2d 719 (4th Cir.1968) ] drew a sharp distinction between the use of the results of compulsory psychiatric examinations on the issue of sanity and the use of an incriminating statement made during a compulsory examination on the issue of guilt. The former is permissible; the latter is constitutionally forbidden. At least seven other United States Courts of Appeals have since indicated agreement with our holding that this kind of statement cannot be used on the issue of guilt.

*Gibson, supra,* 581 F.2d at 78 (citations omitted). *See also, McNeill, supra,* 753 F.Supp. at 1298.

These cases have drawn this distinction because "the purpose of the examination is not to determine whether a defendant did or did not do the criminal acts charged, but whether he possessed the requisite mental capacity to be criminally responsible therefor...." *United States v. Albright,* 388 F.2d 719, 725 (4th Cir.1968).

■ Appellant pled guilty to the general charge of homicide. Such a plea is not a plea of guilt to first degree murder; it is "simply an acknowledgement by a defendant that he

participated in certain acts with a criminal intent." *Common-wealth v. Mitchell,* 528 Pa. 546, 550, 599 A.2d 624, 626 (1991), citing *Commonwealth v. Anthony,* 504 Pa. 551, 475 A.2d 1303 (1984). Once such a plea has been tendered, the Common-wealth bears the burden of proving the essential elements of the higher degree of crime. *Mitchell, supra,* 528 Pa. at 550, 599 A.2d at 626 (citations omitted). Therefore, the degree of homicide for which Appellant would be held criminally liable was to be determined at the degree of guilt hearing.

By asserting the defense of diminished capacity, how-ever, Appellant raised the additional issue of whether she was capable of performing a specified cognitive process. The psychiatric testimony at issue was admitted not to prove Appellant's guilt, which she had already conceded by entering a general plea of guilty to criminal homicide. Nor was it admitted to prove the degree or level of her guilt. Rather, it was admitted to rebut her assertion that because of her mental state at the time of the shooting, she was incapable of forming a specific intent to kill. This was entirely permissible under relevant case law.

In *Isley v. Dugger,* 877 F.2d 47 (11th Cir.1989), the Elev-enth Circuit, in discussing whether a psychiatrist should have been permitted to quote the defendant's statements concern-ing the commission of the crime directly to the jury, noted:

> Dr. Gonzalez testified that he based his opinion of Isley's sanity on several of [the] facts recounted to him by Isley. Dr. Bourkard had testified at trial that the basis for his opinion was Isley's statement to him about his actions during and after the murder. The question is whether the psychiatrists should have been allowed to quote Isley's statements directly to the jury.... Since the statements clearly were used in forming their opinion, ... there was no constitutional error in allowing them to recite statements made by the defendant to explain the basis for their opinion.

*Id.,* 877 F.2d at 49.

Likewise, in the instant case, Appellant's statements were admitted solely as an explanation for Dr. Kool's expert opinion

that Appellant was *capable* of forming a mental state for which she could be held criminally liable. The Commonwealth continued to bear the burden of proving the level of Appellant's criminal intent.

Under similar circumstances, the District of Columbia Circuit noted:

> We recognize that some of the expert's testimony incorporated statements by appellant regarding the manner in which she planned and committed the offense. Had this testimony been admitted for its tendency to buttress appellant's guilt, the self-incrimination question would generate grave concern. But the challenged testimony was elicited solely for the purpose of supporting the experts' conclusion that appellant was criminally responsible for her actions at the time of the offense. Furthermore, since appellant raised no issue as to guilt or innocence apart from her claim of mental illness, we detect no harm from its introduction, and certainly no plain error.

*United States v. Whitlock,* 663 F.2d 1094, 1107 (D.C.Cir.1980) (footnotes omitted).

Therefore, in this case, "the evidence [was] not being received testimonially to establish the guilt of the accused. Rather, it [was] being used circumstantially as it [bore] on the defendant's mental state." *Julian, supra,* 469 F.2d at 376. Accordingly, the psychiatric testimony was admissible in its entirety to rebut the defense of diminished capacity by establishing the basis for Dr. Kool's expert opinion.

■ Having discerned no violation of Appellant's Fifth Amendment rights, it follows that counsel was not ineffective for failing to object to the use of Appellant's statements at trial. We also find no merit to Appellant's claim that counsel was ineffective for failing to call character witnesses on her behalf.

■ It is well settled that trial counsel is presumed to have been effective, and that the defendant bears the burden of proving otherwise. *Commonwealth v. Williams,* 524 Pa. 218, 570 A.2d 75 (1990). To establish counsel's ineffectiveness, the

defendant must prove: 1) that his underlying claim possesses arguable merit; 2) that the course chosen by counsel could have had no reasonable basis designed to serve the defendant's interests; 3) that the defendant was prejudiced by counsel's act or omission. *Commonwealth v. Durst*, 522 Pa. 2, 559 A.2d 504 (1989).

Both the Supreme and Superior Courts of this Commonwealth have held that an attorney who fails to use character evidence on behalf of a defendant can be deemed ineffective if there is no reasonable basis for such failure. *Commonwealth v. Mickens*, 409 Pa.Super. 266, 597 A.2d 1196 (1991); *Commonwealth v. Thuy*, 424 Pa.Super. 482, 623 A.2d 327 (1993). To be admissible, however, character evidence must be relevant, having a " 'proper relation to the subject-matter of the charge at issue ...,' " and such evidence "is permitted on the theory that general reputation reflects character and a person with a good character for peaceableness, for example, would not in all reasonable probability commit an unlawful act of violence." *Commonwealth v. Castellana*, 277 Pa. 117, 122–123, 121 A. 50, 51–52 (1923) (citation omitted).

Since Appellant had already pled guilty to the unlawful act of criminal homicide, evidence of her good character would have been irrelevant at the degree of guilt hearing; therefore, counsel could not have been ineffective for failing to present such evidence.

Having found no merit to any of the issues presented by Appellant, we affirm the judgment of sentence.

HUDOCK, J., files a Concurring and Dissenting Opinion in which CAVANAUGH and JOHNSON, JJ., join.

DEL SOLE, J., files a separate Concurring and Dissenting Opinion.

DEL SOLE, Judge, concurring and dissenting.

I join the concurring and dissenting opinion authored by Judge Hudock and its reasoning that the testimony in question was not admissible by virtue of the Fifth Amendment of

the United States Constitution. I write separately, however, to remark on the statement made in the majority opinion on page eight in footnote one which claims that the Pennsylvania constitutional right against self-incrimination found at Article 1, Section 9 is coextensive with the federal right.

The Majority and the Dissent rely on a footnote in *Commonwealth v. Marra*, 527 Pa. 526, 594 A.2d 646 (1991) which makes that statement citing *Commonwealth v. Carrera*, 424 Pa. 551, 227 A.2d 627 (1967). The difficulty with relying on that footnote is twofold. First, in the *Marra* case, the issue of the application of the privilege was held not to be before the Court. Second, *Carrera* did not make such a pronouncement. Rather, while the court in *Carrera* referred to the privilege existing in both the state and federal constitutions, it discussed the application of the Fifth Amendment right as now applying to both federal and state proceedings, the latter by virtue of the Fourteenth Amendment.

To claim that these state and federal rights are coextensive ignores other important considerations. First, in *D'Elia v. Pennsylvania Crime Commission*, 521 Pa. 225, 555 A.2d 864 (1989) our Supreme Court analyzed the question of use and derivative use immunity by a non-legislative, non-administrative body. Its analysis focused solely on our state's constitutional protection, and the court stated: "Nor have we held that for all purposes Article 1, Section 9 and the Fifth Amendment are co-extensive." *Id.* at 236 ftn. 1, 555 A.2d 864.

Further, while the Federal constitution establishes certain minimum levels of protection below which the states cannot go, the states may offer greater protections to their citizens. More particularly, where a state constitutional right has been held to be co-extensive with a federal right as then defined, it does not follow that a subsequent re-evaluation of that right by the United States Supreme Court which has the effect of limiting the right, requires continued co-extensive application.

In *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991) our Supreme Court established the method of reaching and deciding Pennsylvania Constitutional issues. That meth-

odology has not and need not be utilized in the matter before us. However, under these circumstances, we should refrain from any expression of opinion on the application of the Pennsylvania Constitution.

HUDOCK, Judge, concurring and dissenting.

Today the majority puts a chink in the heretofore impregnable Fifth Amendment to the Federal Constitution. It does so by finding no ineffectiveness on the part of counsel who allowed the prosecution to introduce incriminating statements made by his client to an agent of the prosecution without the benefit of *Miranda* warnings. I am compelled to dissent.

There is a critical distinction between having an expert testify to the results of an examination and having him testify to actual statements made by a defendant. Appellant pled guilty to homicide in general; not to any specific degree. She admitted the act of killing but not the mental state accompanying the act. Consequently, at the degree of guilt hearing, the court was required to determine whether Appellant was guilty of first-degree murder, third-degree murder, voluntary manslaughter or even involuntary manslaughter.

It is well-established that, as a general principle, all crimes involve two essential elements: the "act" (sometimes referred to as *actus reus*) and the "guilty mind" (sometimes referred to as *mens rea*). A person cannot be convicted of a crime without proof of both essential general elements. In each of the types of homicide, the "act" is the unjustified killing of a human being. The *mens rea* of each of the types of homicide however is different. In first-degree murder, defined in 18 Pa.C.S.A. section 2502(a), it is an intentional killing. Intentional killing is further defined as "willful, deliberate and premeditated." 18 Pa.C.S.A. § 2502(d). Third-degree murder is defined in section 2502(c) of the Crimes Code as all other kinds of murder. Murder, although not defined by the Crimes Code, is defined by case law as a killing committed "at the very least with malice aforethought." *Commonwealth v. Reilly*, 519 Pa. 550, 564, 549 A.2d 503, 510 (1988). Furthermore, malice may be found to exist "where there is a wicked-

ness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Id.* (*quoting Commonwealth v. Drum*, 58 Pa. 9, 15 (1868)).

The *mens rea* of voluntary manslaughter is defined in section 2503(a) of the Crimes Code as "sudden and intense passion resulting from serious provocation[.]" Finally, the *mens rea* for involuntary manslaughter is defined in section 2504(a) of the Crimes Code as acting in a "reckless or grossly negligent manner[.]" Consequently, the *mens rea* for homicide varies in degree from "willful, deliberate and premeditated" all the way down to merely recklessness or gross negligence.

Appellant pled guilty only to the "act", not to the *mens rea.* It was for the trial court to determine the *mens rea* at the degree of guilt hearing. Therefore, Appellant cannot be said to have pled guilty to any of the specific types of homicide, and Appellant's plea could not be considered a conviction until the degree of guilt hearing was concluded and a result was reached by the court as to the specific type of homicide. This distinction is crucial because the evidence presented at the degree of guilt hearing necessarily involved proof of an essential element of the crime, the *mens rea* and, therefore, bore significantly on the issue of guilt.

The Commonwealth sought to prove that Appellant committed first-degree murder and, therefore, offered evidence to prove Appellant's specific intent to kill, that is, that Appellant acted willfully, deliberately and with premeditation. Appellant, on the other hand, presented the defense of diminished capacity. This defense concedes the act, which was consistent with Appellant's guilty plea, but seeks to negate the *mens rea* of first-degree murder. *Commonwealth v. Anderson*, 410 Pa.Super. 524, 600 A.2d 577 (1991), *alloc. den.*, 531 Pa. 644, 612 A.2d 983 (1992). Because Appellant sought to establish diminished capacity through expert psychiatric testimony, and Appellant thought another psychiatrist would support her claim, Appellant joined the Commonwealth in requesting a court-ordered psychiatric examination.

At the conclusion of the degree of guilt hearing, the trial court found that the Commonwealth had satisfied its burden beyond a reasonable doubt that Appellant had acted with the specific intent to kill, that is, the Commonwealth had proven the *mens rea* required to find Appellant guilty of first-degree murder.

The Commonwealth has argued strenuously for the admission of the statements made by Appellant, as testified to by Dr. Kool, by citing numerous decisions of the federal courts concerning their use in hearings to determine the sanity of a defendant. I find those decisions to be both distinguishable from our present case and illustrative of the deep concern the federal courts have expressed with regard to this type of evidence. Unlike a diminished capacity defense which seeks to negate the *mens rea* element of the crime, a sanity defense focuses not on the elements of the crime but the legal sanity of the accused at the time the offense is committed. Legal insanity is defined as:

> [t]he actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

18 Pa.C.S.A. § 315(b). Insanity is a complete defense to the crime involved, although rather than being automatically released, as in other acquittals, a defendant will be examined under the Mental Health Procedures Act, 50 P.S. section 7301 *et seq.*, to determine whether he should be committed for treatment. When an insanity defense is presented, the court does not examine the elements of the crime to determine if a defendant has negated any of those elements. For this reason, the admission of the statements of the accused to a psychiatrist on the issue of sanity are logically distinct from statements which could be used to determine the accused's guilt. An insane person has the capacity to kill with specific intent. That is, he can premeditate, act willfully and deliberate. What relieves him from responsibility is that he does not know the nature and quality of the act or does not know that the rest of society considers it to be wrong. For that reason,

any statements made by one claiming insanity concerning the killing itself are superfluous; they are not necessary to prove the *mens rea* or *actus reus*. "[I]n a plea of not guilty by reason [of] insanity the defendant acknowledges guilt." *Commonwealth v. Trill*, 374 Pa.Super. 549, 601, 543 A.2d 1106, 1132 (1988), (*alloc. den.*, 522 Pa. 603, 562 A.2d 826 (1989) (Concurring Opinion by Beck, J.)). The person claiming insanity says "yes, I did it, and I intended to do it, but I did not know the nature and quality of my act or I did not know it was wrong." As the Fifth Circuit Court of Appeals stated in *United States v. Leonard*, 609 F.2d 1163, 1165–66 (5th Cir. 1980):

> ... Because sanity at the time of the commission of the alleged offense bears heavily on the issue of guilt, it implicates Fifth Amendment concerns. Thus, there is a sharp distinction between the use of the defendant's statements made during a court-ordered psychiatric examination on the issue of sanity and the use, before the "fact finders" (here a jury), of incriminating statements made during such psychiatric examination on the issue of guilt and before guilt had been determined. *See Gibson v. Zahradnick*, 581 F.2d 75, 78 (4th Cir.1978), *cert. den.* 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978); *United States v. Bennett*, 148 U.S.App. D.C. 364, 370–72, 460 F.2d 872, 878–80 (D.C.Cir.1972). Therefore, central to the court's authority to order a defendant to submit to a psychiatric examination is what we believe to be a clear understanding that the function of the statements obtained during the examination is limited to the sanity issue.

> There is another obvious rationale behind the rule. Both the Government and the defendant may need the assistance of expert testimony of the issue of sanity. In many cases, psychiatrists would not be able to obtain reliable testimony unless they were free to inquire into the prior conduct of the defendant, including his participation in the criminal activity with which he is charged. Moreover, the psychiatric inquiry cannot succeed unless the defendant cooperates; a defendant's mental condition would not be discovered in many instances unless the psychiatrist can engage in a candid

conversation with the defendant about it. Therefore, it may be appropriate and even in some cases necessary for the psychiatrist, [w]hen testifying on the issue of sanity, to disclose the criminal activity related to him by the defendant. [footnote omitted.]

The Commonwealth argues that the federal cases drawing a distinction between determinations of sanity and issues of guilt are based upon a rule of federal criminal procedure and a federal statute which have either been repealed or amended since those decisions were issued. I recognize that the wording of Fed.R.Crim.P. 12.2, which requires defendants to give notice of a mental condition defense, has been amended over the course of the years; however, the rationale behind the rule and the spirit of its language has not been altered so as to make a fundamental change in the underlying principle for which it stands. At the time of the *Leonard* decision the rule read in pertinent part as follows:

No statement made by the accused in the course of any examination provided for by this rule, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.

Fed.R.Crim.P. 12.2(c) (as cited in *United States v. Halbert*, 712 F.2d 388, 389 (9th Cir.1983)). In 1983, the pertinent portion of the rule was amended to read as follows:

No statement made by the defendant in the course of any examination provided by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced testimony.

Fed.R.Crim.P. 12.2(c) as amended. This is the current language of the rule as well. It is clear from the plain language of this rule that Congress was drawing a distinction between use connected with sanity determinations and other uses concerned with the determination of guilt and protecting the

accused's sacred Fifth Amendment right against self-incrimination by limiting the use of evidence gathered as a result of court-ordered psychiatric examination. As further evidence of this concern, the advisory committee action notes following the rule, concerning the 1975 amendment, state:

The purpose of this rule is to secure the defendant's fifth amendment right against self-incrimination. See *State v. Raskin,* 34 Wis.2d 607, 150 N.W.2d 318 (1967). The provision is flexible and does not totally preclude the use of such statements. For example, the defendant's statement can be used at a separate determination of the issue of sanity or for sentencing purposes once guilt has been determined. A limiting instruction to the jury in a single trial to consider statements made to the psychiatrist only on the issue of sanity would not satisfy the requirements of the rule as amended. The prejudicial effect on the determination of guilt would be inescapable.

Notes of Committee on Judiciary on 1975 Amendments to Rule (House Report No. 94–247)(B). Furthermore, in the comments concerning the 1983 amendment on subdivision (c), it is stated:

The last sentence of subdivision (c) has been amended to more accurately reflect the Fifth Amendment considerations at play in this context. *See Estelle v. Smith,* 451 U.S. 454 [101 S.Ct. 1866, 68 L.Ed.2d 359] (1981), holding that self-incrimination protections are not inevitably limited to the guilt phase of a trial and that the privilege, when applicable, protects against use of defendant's statement and also the fruits thereof, including expert testimony based upon defendant's statements to the expert. *Estelle* also intimates that "a defendant can be required to submit to a sanity examination," and presumably some other form of mental examination, when "his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case."

Notes of Advisory Committee on 1983 Amendments to Rules.

It is clear from the historical background of the rule and cases interpreting it that to sweep away the carefully crafted

distinction made by the federal courts in this area is to determine guilt by tainted statements obtained from an accused in violation of her Fifth Amendment right against self-incrimination.

The majority relies on cases which hold that when a defendant places his sanity at issue, he may be subjected to compulsory examination by a court-appointed psychiatrist, and that psychiatric testimony may be introduced at trial to rebut the insanity defense without violating the Fifth Amendment. Under the *M'Naughten* rule, *see* 18 Pa.C.S.A. § 315, which governs the insanity defense in this Commonwealth, a defendant is legally insane and absolved of criminal responsibility if, at the time of committing the act, due to a defect of reason or disease of mind, the accused either did not know the nature and quality of the act or did not know that the act was wrong. *Commonwealth v. Heidnik,* 526 Pa. 458, 587 A.2d 687 (1991).

But the issue here is not insanity; the issue is diminished capacity to form the specific intent to kill. Appellant does not claim that due to a defect of reason or disease of mind she did not know the nature and quality of the act or that if she did, she did not know the act was wrong. Rather, she maintains that she had a weakened ability to form the specific intent to kill necessary for first-degree murder. In effect, Appellant claims that she had a weakened ability to act willfully, deliberately, and with premeditation. By her plea of guilty to homicide generally, all she admitted was the act of killing, and by not claiming insanity, Appellant acknowledged that the killing did not occur because of a defect of reason or disease of mind which caused her either not to know the nature and quality of her act or, if she did know the nature and quality of the act, that she did not know the act was wrong. It remained for the Commonwealth to prove whether the killing was first or third degree murder, or voluntary or involuntary manslaughter. *Commonwealth v. Weaver,* 500 Pa. 439, 457 A.2d 505 (1983) (an accused offering evidence under the theory of diminished capacity concedes general criminal liability). I therefore must dissent from the majority holding on this issue.

I do, however, agree with the majority's discussion and analysis of the issue of whether Appellant should have been compelled to submit to a court-ordered psychiatric examination, and therefore, join that portion of the majority's opinion.

CAVANAUGH and JOHNSON, JJ., join.